FILED
2022 Mar-09  AM 10:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | | |
|---|---|---|
| MELISSA ANN SPURGEON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-cv-00782-NAD |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER
## AFFIRMING THE DECISION OF THE COMMISSIONER
## AND DENYING PLAINTIFF'S MOTION TO REMAND

Pursuant to 42 U.S.C. § 405(g), Plaintiff Melissa Ann Spurgeon filed for review of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner") on her claim for disability benefits based on paroxysmal supraventricular tachycardia, venous insufficiency status post ablation, obesity, anxiety, history of vertigo and syncope, moderate to severe tricompartmental chondromalacia in right knee, and dysautonomia/postural orthostatic tachycardia syndrome. Doc. 1. Plaintiff Spurgeon applied for disability benefits for the period from February 12, 2016, to March 31, 2020, and the Commissioner denied her claim. Doc. 10-6 at 4–5; Doc. 10-3 at 59, 62, 64.

Spurgeon also filed a "Motion To Remand Pursuant To Sentences 4 & 6,"

based on a subsequent favorable decision regarding benefits.  Doc. 17.

Pursuant to 28 U.S.C. § 636(c)(1) and Federal Rule of Civil Procedure 73, the parties have consented to magistrate judge jurisdiction.  Doc. 12.  After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision, and **DENIES** Spurgeon's motion to remand (Doc. 17).

## ISSUES FOR REVIEW

In this appeal, Plaintiff Spurgeon argues that the court should reverse the Commissioner's decision for three reasons:  (1) the Administrative Law Judge (ALJ) erred in determining that Spurgeon did not satisfy the criteria for disability under "Listing 4.11" for chronic venous insufficiency; (2) the ALJ failed to accord proper weight to opinions from Spurgeon's treating physician—Dr. William Barton Perry—and failed to show good cause for finding those opinions unpersuasive; and (3) the Appeals Council erred in failing to review new, material, and chronologically relevant evidence.[1]  Doc. 13 at 2.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for

---

[1] For ease of review, the court presents these issues in a sequence that is different from Spurgeon's briefing.  Docs. 13, 16.

disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages:  (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled.  The ALJ must determine the following:

(1)   whether the claimant is engaged in substantial gainful activity;

(2)   if not, whether the claimant has a severe impairment or combination of impairments;

(3)   if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

3

(4)    if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)    if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211. At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act; the court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper

legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.**   With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the ALJ. *Winschel*, 631 F.3d at 1178 (quotation marks and citation omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (similar).

**B.**  With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.

## BACKGROUND

### A.    Plaintiff Spurgeon's personal and medical history

Plaintiff Spurgeon was born on February 18, 1974, and was 44 years old at the time that she applied for benefits on February 21, 2018.  Doc. 10-6 at 4. Spurgeon previously had worked as a medical assistant.  Doc. 10-7 at 23, 115.

At the time that she applied for benefits, Spurgeon alleged disability with an onset date of February 12, 2016, based on orthostatic hypotension, dysautonomia, palpitations, hypertension, paroxysmal supraventricular tachycardia, anxiety, mitral valve prolapse, obesity, blood pooling in lower extremities, and brain fog.  Doc. 10-7 at 17, 21.

Spurgeon submitted medical records showing that in September 2014 she had gone to the emergency department of the Riverview Regional Medical Center because she felt faint and anxious driving down the road; she was diagnosed with a bladder infection and anxiety reaction.   Doc. 10-8 at 3–19.

In October 2014, Spurgeon saw Dr. William Barton Perry, a primary care provider, for a new patient checkup; her only complaint was that her hair was coming out.  Doc. 10-9 at 116.  Spurgeon's patient history said that she had experienced a

panic attack for the first time two-to-three weeks before her appointment and had been prescribed the medication Xanax. Doc. 10-9 at 116.

On November 18, 2014, Spurgeon again presented to the Riverview emergency department with near syncope (i.e., near fainting) because she was in Walmart and felt like she was going to faint. Doc. 10-8 at 20–57. Spurgeon was taking a new diet pill at the time and was taking Xanax. Doc. 10-8 at 21. She was admitted to the hospital, but was discharged on November 20, 2014, with normal test results except for trace mitral valve prolapse. Doc. 10-8 at 27–57.

On November 24, 2014, Spurgeon had a follow-up appointment with Dr. William Barton Perry, during which he diagnosed her with mitral valve prolapse. Doc. 10-7 at 119.

From December 2014 to January 2015, Spurgeon wore a heart monitor at the direction of Dr. Virenjan Narayan at the North Alabama Cardiology Center; after reviewing the results, Dr. Narayan diagnosed Spurgeon with palpitations and anxiety disorder. Doc. 10-10 at 2–6.

In January 2017, Spurgeon returned to the North Alabama Cardiology Center, complaining of severe fatigue. Doc. 10-7 at 121. She was assessed with obesity, anxiety, and hypertension. Doc. 10-7 at 121.

Shortly thereafter, Spurgeon had a follow-up appointment with Dr. William Barton Perry, who noted stress-related dysautonomia and put her on Vitamin B12.

7

Doc. 10-9 at 124.  An x-ray of her chest was normal.  Doc. 10-7 at 121.  A study by Dr. Narayan in January 2017 showed mostly normal heart appearance and function with only trace mitral regurgitation.  Doc. 10-10 at 7–9.

In March and early May 2017, Spurgeon returned to Dr. William Barton Perry with symptoms including continuing numbness and weakness; Dr. Perry gave her a Vitamin B12 injection, and noted that her anxiety was controlled by Xanax and that her dysautonomia was controlled.  Doc. 10-9 at 126–28.  An MRI in late May 2017 revealed no brain abnormality.  Doc. 10-9 at 137.

On September 5, 2017, Spurgeon again saw Dr. William Barton Perry.  Doc. 10-9 at 129.  Dr. Perry noted that Spurgeon had been having blood pressure issues, likely due to dysautonomia, so he was sending her to a dysautonomia specialist.  Doc. 10-9 at 129.  Dr. Perry also noted that Spurgeon was not taking any blood pressure medication and did not have any edema.  Doc. 10-9 at 129.

On September 18, 2017, Spurgeon returned to Riverview, complaining of increased palpitations.  Doc. 10-8 at 124; Doc. 10-9 at 4–5, 39–42, 61–65.  She was discharged with no notable problems and directions to have a follow-up appointment with Dr. Narayan.  Doc. 10-9 at 41.  A couple days later, Spurgeon returned to Dr. Narayan at the Cardiology Center because of her palpitations; she again was put on a heart monitor that showed essentially normal results.  Doc. 10-10 at 15–19.

On November 1, 2017, Spurgeon saw Dr. Paula Moore at Dysautonomia MVP

Center LLC with complaints of tachycardia, palpitations, and dizziness. Doc. 10-9 at 107–12. Spurgeon presented to be assessed for dysautonomia due to worsening postural tachycardia. Doc. 10-9 at 109. Dr. Moore found that Spurgeon had mild depression. Doc. 10-9 at 109. Dr. Moore also noted that Spurgeon was on the medication Toprol, which had been "a lifesaver for her," such that she still had occasional spells related to dysautonomia but they were more manageable and often happened at bedtime. Doc. 10-9 at 110. Dr. Moore assessed Spurgeon with having precordial pain, palpitations, dizziness, tachycardia (unspecified), migraine (unspecified), generalized anxiety disorder, and obesity. Doc. 10-9 at 111. Dr. Moore diagnosed Spurgeon with "mild dysautonomia in addition to deconditioning and also anxiety." Doc. 10-9 at 111. Dr. Moore ran multiple tests, which all were normal, including a tilt autonomic nervous system test. Doc. 10-9 at 107–12. Dr. Moore recommended that Spurgeon increase her Toprol, perform exercise appropriate for her BMI, and drink a minimum of 64 ounces of water per day. Doc. 10-9 at 111.

In January 2018, Spurgeon returned to Dr. William Barton Perry because she had lesions on her chest and hands, some due to bee stings. Doc. 10-9 at 153. Dr. Perry noted that Spurgeon had been diagnosed with dysautonomia and anxiety and was taking the medications Celexa and Xanax. Doc. 10-9 at 153.

In March 2018, Spurgeon returned to Dr. Narayan with palpitations and leg

pain and swelling at times.  Doc. 10-10 at 20.  Dr. Narayan diagnosed Spurgeon with paroxysmal supraventricular tachycardia, edema, and symptomatic chronic peripheral venous insufficiency, among other things.  Doc. 10-10 at 20–22.

In April 2018, Dr. Narayan performed a venous doppler study for insufficiency and found reflux but no clots or tortuous vessels; he recommended an ablation.  Doc. 10-10 at 69.

On April 10, 2018, Spurgeon saw a licensed psychologist, Dr. Jerry Bynum, who completed a psychological assessment report.  Doc. 10-10 at 26.  Dr. Bynum found that Spurgeon never had been diagnosed or treated by a mental health provider and never had been hospitalized for mental health symptoms, but that she had received treatment from her primary care physician.  Doc. 10-10 at 26.  Dr. Bynum noted that Spurgeon thought she had experienced anxiety for most of her life, but that it had worsened since 2016.  Doc. 10-10 at 26.  He noted that Spurgeon said that her medication helped her symptoms, and that she was anxious leaving the house and liked to speak on the phone when driving to help her anxiety.  Doc. 10-10 at 27.  Dr. Bynum recounted Spurgeon's history, which included sexual abuse when she was a child.  Doc. 10-10 at 27.

Bynum stated that Spurgeon was neatly dressed and groomed, was pleasant and cooperative, and discussed her motivation to go back to work to be a good example for her 14-year-old son.  Doc. 10-10 at 27–28.  Dr. Bynum found Spurgeon

to have average thinking and processing skills.  Doc. 10-10 at 28.  Spurgeon told Dr. Bynum that she typically went to bed around 9:00 pm, woke up around 6:00 am, had interrupted sleep, did daily activities like chores as she was able, was independent in self-care if she could sit down, and did not engage in social activities.  Doc. 10-10 at 28.  Dr. Bynum diagnosed Spurgeon with generalized anxiety disorder and mild depression.  Doc. 10-10 at 28.  Dr. Bynum opined that Spurgeon had no cognitive impairments, mild impairments in carrying out instructions, and moderate social impairments, but that her primary impairments were medical rather than attributable to her mental health.  Doc. 10-10 at 29.

In April and May 2018, Spurgeon again saw Dr. Narayan and wore a heart monitor; the results were largely normal.  Doc. 10-10 at 70–81.  Dr. Narayan diagnosed Spurgeon with symptomatic chronic peripheral venous insufficiency, an abnormal venous doppler, and stasis dermatitis.  Doc. 10-10 at 82–83.  He recommended stockings, elevation of legs, walking, and ablation if symptoms persisted.  Doc. 10-10 at 83.

On July 6, 2018, Spurgeon returned to Dr. Narayan for a follow-up appointment to consider potential ablation.  Doc. 10-10 at 88–90.  He recommended that Spurgeon continue with her current medications of Toprol, Xanax, and Celexa.  Doc. 10-10 at 90.

On July 9, 2018, Dr. William Barton Perry filled out a "Mental Health Source

11

Statement," opining on Spurgeon's functional limitations based on her mental health conditions.  Doc. 10-10 at 91.  Dr. Perry stated that Spurgeon could carry out simple instructions, could not stay on-task for at least two hours, could not be punctual within customary tolerances, could not sustain an ordinary routine without special supervision, could not adjust to routine and frequent work changes, could not interact with supervisors and coworkers, and could not maintain standards of socially appropriate behavior or neatness and cleanliness.  Doc. 10-10 at 91.  He also stated that she would be off-task 80% of the time and miss work 15 out of 30 days.  Doc. 10-10 at 91.  He stated that Spurgeon's limitations had existed since February 2016. Doc. 10-10 at 91.

Also on July 9, 2018, Dr. William Barton Perry filled out a "Physical Capacities Form," opining that Spurgeon only could sit or stand for an hour at a time, would need to have her legs above waist level for 5 hours per day, would be off-task for 60% of an average workday, and would miss 10 days of work per month due to her physical problems.  Doc. 10-10 at 92.  Dr. Perry stated that the limitations had existed since February 2016.  Doc. 10-10 at 92.

On December 4, 2018, Dr. Narayan performed venous ablation on Spurgeon's lower leg.  Doc. 10-10 at 129.  At follow-up appointments, Dr. Narayan noted that doppler studies showed good blood flow.  Doc. 10-10 at 134, 228.

On January 1, 2019, Spurgeon visited Dr. William Barton Perry with a bruise

12

on her leg.  Doc. 10-10 at 112–14.  Dr. Perry found no clotting or other issues beyond a small bone spur in her knee.  Doc. 10-10 at 112–14.  Spurgeon had an MRI on her right knee in February 2019, which revealed tricompartmental osteoarthritis and potential patellofemoral instability.  Doc. 10-10 at 96–97.  Spurgeon then visited Riverview multiple times in March 2019 for knee pain.  Doc. 10-7 at 131.

On March 13, 2019, Spurgeon had another follow-up appointment with Dr. Narayan regarding her ablation; Dr. Narayan recommended continuing Spurgeon's current medication.  Doc. 10-10 at 225–27.

On June 4, 2019, Spurgeon returned to the Dysautonomia MVP Center and saw Dr. Moore again.  Doc. 10-10 at 102.  Dr. Moore noted that Spurgeon had severe depression and anxiety.  Doc. 10-10 at 102.  Dr. Moore also noted that Spurgeon had passed out three times since her last visit.  Doc. 10-10 at 103.  Dr. Moore suggested following up for different mental health medication and exercise.  Doc. 10-10 at 104.

On June 27, 2019, Spurgeon saw Dr. Narayan, who did a doppler study and found no evidence of significant peripheral vascular disease.  Doc. 10-10 at 223–34.

On September 3, 2019, Spurgeon returned to the Dysautonomia MVP Center, where Dr. Moore noted that Spurgeon would need to increase her water and salt intake and avoid excessive exposure to heat because of her dysautonomia and postural orthostatic tachycardia syndrome.  Doc. 10-10 at 106.

On September 19, 2019, Dr. Narayan did another arterial doppler study and

13

found no evidence of significant peripheral vascular disease.  Doc. 10-10 at 135–37.

**B.      Social Security administrative proceedings**

**1.      Initial application and denial of benefits**

On February 21, 2018, Spurgeon filed an application for disability insurance benefits, with an alleged disability onset date of February 12, 2016.  Doc. 10-6 at 4–5.  As noted above, Spurgeon stated that she suffered from orthostatic hypotension, dysautonomia, palpitations, hypertension, paroxysmal supraventricular tachycardia, anxiety, mitral valve prolapse, obesity, blood pooling in lower extremities, and brain fog.  Doc. 10-7 at 21.

In June 2018, Spurgeon's disability insurance benefits claim was initially denied because Spurgeon did not qualify as disabled based on the evidence presented.  Doc. 10-4; Doc. 10-5 at 2–6.

On July 9, 2018, Spurgeon then filed a request for a hearing with an ALJ.  Doc. 10-5 at 9–10.

**2.      ALJ hearing**

On October 22, 2019, an ALJ conducted a hearing to determine if Spurgeon was disabled.  Doc. 10-3 at 37.  At the beginning of the hearing, Spurgeon's counsel stated that Spurgeon suffered from tachycardia and weakness due to mitral valve prolapse, as well as postural orthostatic tachycardia, irritable bowel syndrome, right knee pain, vertigo, stasis dermatitis, chronic venous insufficiency, anxiety, and

14

depression.  Doc. 10-3 at 38–39.

### a.     Spurgeon's testimony about her symptoms

Counsel asked Spurgeon about why she had left her most recent full-time job. Doc. 10-3 at 39.  Spurgeon testified that "the anxiety, I guess was the issue," because she thought her coworkers were talking about her, and she "went off" at a supervisor after previous conflicts and "was offered to resign or be terminated."  Doc. 10-3 at 39–40.

Spurgeon also testified that, around that time—February 2016—she was having "passing out spells" and "had chest pains really bad," such that at one point she ran into a funeral home to call 911.  Doc. 10-3 at 40.  Spurgeon testified that, at that time, she did not know she had postural orthostatic tachycardia, but she knew that she had mitral valve prolapse, anxiety, and depression.  Doc. 10-3 at 40.

Spurgeon testified that she also was having leg pain.  Doc. 10-3 at 41.  She testified that her leg problems were ongoing and that providers had performed ablations in both legs because she had non-healing sores on her legs caused by chronic venous insufficiency.  Doc. 10-3 at 41.  She stated that she had to elevate her legs for about 4 hours per day between 8:00 am and 5:00 pm to "bring[] the blood flow down."  Doc. 10-3 at 42.

Spurgeon testified that she had trouble standing because her heartrate goes up "extremely high," and then when she sits down it "drops like a rock."  Doc. 10-3 at

43.  Spurgeon testified that she had trouble standing for more than 10 minutes at a time, needs to use the restroom about every 5 minutes because of her required fluid intake, and could not watch a 2-hour movie without falling asleep or losing focus. Doc. 10-3 at 44–45.  Spurgeon testified that she also gets vertigo for about "a week or so" on a monthly basis.  Doc. 10-3 at 46.  She testified that her irritable bowel syndrome required her to go to the restroom after eating, and that she has problems with her knee.  Doc. 10-3 at 46–47.  Spurgeon testified that she could bathe and dress, but that she has a chair in her bathtub so that she can sit down.  Doc. 10-3 at 47.

The ALJ then questioned Spurgeon, who testified that she had no income, was helped by her mother, and lived in a house with her son.  Doc. 10-3 at 48.  She testified that she chose not to receive food stamps.  Doc. 10-3 at 48.

When the ALJ asked what a typical day was like for her, Spurgeon testified that she had to "take [her] time to get out of the bed," then took her son to school a few blocks away and came back, then tried to exercise a little bit during the day on a treadmill (as her doctor instructed), but frequently had to sit down or lie down on the floor and put her feet up in the air, then went to bed by 6:00 pm or sometimes 5:00 pm.  Doc. 10-3 at 48–49.  She said that she was just "so exhausted," even when she was "not doing anything" or just "try[ing] to make the bed."  Doc. 10-3 at 48. She said that her dysautonomia—"dysfunction of the autonomic system"—affected

her whole being, including her breathing, heart rate, blood pressure, sweating, and vision, and that dysautonomia was rare but "very serious." Doc. 10-3 at 49. She said that there was "nothing they can do" and "no cure" for her dysautonomia. Doc. 10-3 at 50.

The ALJ asked if Spurgeon's dysautonomia doctor, Dr. Moore, had said that Spurgeon's fainting spells were not related to her dysautonomia, and Spurgeon said that Dr. Moore said that she did not know if the fainting was related to dysautonomia. Doc. 10-3 at 50–51. The ALJ pointed out that Dr. Moore also reviewed testing for positional orthostatic tachycardia and said it was negative, then the ALJ asked Spurgeon if another doctor had told Spurgeon that she still had that condition. Doc. 10-3 at 51. Spurgeon responded not by directly addressing the ALJ's question about postural orthostatic tachycardia, but simply by saying that Dr. Moore told her that her anxiety and dysautonomia "feed off each other." Doc. 10-3 at 51.

### b.   Vocational expert testimony

A vocational expert (or "VE"), Bonnie Ward, then testified. Doc. 10-3 at 52. The ALJ posed hypotheticals to Ward, who stated that a hypothetical individual with Spurgeon's limitations would not be able to perform any of Spurgeon's past work, but could perform other jobs existing in the national economy in significant numbers. Doc. 10-3 at 53–55.

### 3.      ALJ decision

On November 13, 2019, the ALJ entered an unfavorable decision.  Doc. 10-3 at 59.  The ALJ concluded that Spurgeon was not disabled at any time during the relevant period between February 12, 2016, and the date of the decision, and consequently that she was ineligible for social security benefits.  Doc. 10-3 at 76.

In the decision, the ALJ found that Spurgeon's last insured date was March 31, 2020, so she had to establish disability on or before that date.  Doc. 10-3 at 62, 64.

The ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. § 404.1520(a)(4); *Winschel*, 631 F.3d at 1178).  Doc. 10-3 at 64.  The ALJ found at step one that Spurgeon was insured through March 31, 2020, and that she had not engaged in substantial gainful activity since the alleged onset date of February 12, 2016.  Doc. 10-3 at 64. At step two, the ALJ found that Spurgeon had severe impairments, including the following:  "paroxysmal supraventricular tachycardia; venous insufficiency status post ablation; obesity; anxiety; hypertension; history of vertigo and syncope; moderate to severe tricompartmental chondromalcia right knee; and dysautonomia/postural orthostatic tachycardia syndrome (POTS)."  Doc. 10-3 at 64.

At step three, the ALJ determined that Spurgeon did not have an impairment or combination of impairments that met or medically equaled the severity of any

"Listing of Impairments" in the applicable Social Security regulations.  Doc. 10-3 at 65.  In relevant part, the ALJ stated that the evidence showed that Spurgeon's chronic venous insufficiency did not meet or medically equal the requirements for "Listing 4.11."  Doc. 10-3 at 65.

Because Spurgeon did not meet any "Listing," the ALJ determined Spurgeon's "residual functional capacity" (RFC), finding that she could "perform light work" except that she could only occasionally climb ramps or stairs, could not climb ladders or scaffolding, could only occasionally balance, kneel, stoop, crouch or crawl, should avoid concentrated exposure to extreme stimuli, should avoid unprotected heights and dangerous moving machinery, required a sit/stand option, had the capacity to complete simple routine work tasks with non-confrontational supervision, would need to avoid constant work-related contact with the public, and was able to adapt to limited work changes.  Doc. 10-3 at 67.

In arriving at that determination, the ALJ exhaustively considered Spurgeon's medical records.  Doc. 10-3 at 67–75.  The ALJ discounted as unpersuasive Dr. William Barton Perry's "Mental Health Source Statement" and "Physical Capacities Form" opinions from July 9, 2018, because those opinions did not provide a "nexus between the conditions he cites and the limitations such as being off-task, missing ten days of work per month, and the requirement of lying down, sleeping, and propping the legs above waist for five hours per day."  Doc. 10-3 at 73.  The ALJ

specifically addressed Spurgeon's medical records from Dr. William Barton Perry's office from October 2014 to July 2019, stating that the records were not consistent with Dr. Perry's July 9, 2018 opinions, because those records showed that Spurgeon had been encouraged to exercise, had mostly normal test results, had controlled her anxiety disorder with Xanax, and was taking other medication to control her symptoms.  Doc. 10-3 at 73–74.  The ALJ then found that Dr. Perry's opinions also were inconsistent with other medical records from other medical providers, which indicated that Spurgeon's test results were largely normal, that her mental health problems did not significantly affect her ability to function, that she never had been hospitalized or treated by a specialist for mental health issues, that she could exercise and perform many daily activities, and that her legs had been improved by her ablation procedure.  Doc. 10-3 at 74.  Considering Spurgeon's RFC, the ALJ found at step four of the sequential disability analysis that Spurgeon could not perform any of her past relevant work.  Doc. 10-3 at 75.

At step five, the ALJ determined that Spurgeon was not disabled because, based on the testimony of the vocational expert and considering Spurgeon's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform.  Doc. 10-3 at 75.  Those jobs included electrical accessory assembler, small product assembler, and inspector hand packager.  Doc. 10-3 at 76.

### 4.   Additional evidence that Spurgeon submitted to the Appeals Council

After the ALJ issued that decision, Spurgeon submitted additional evidence for review to the Appeals Council.

### a.   Records from Dr. William Barton Perry's office

Spurgeon submitted medical records from Dr. William Barton Perry, dated December 5, 2019, which indicated that Spurgeon had a chief complaint of "[r]ash on legs." Doc. 10-3 at 24. The records stated that Spurgeon had skin lesions on her lower legs and had eczema. Doc. 10-3 at 25–26.

Spurgeon submitted another set of records from Dr. William Barton Perry, dated January 9, 2020, in which Dr. Perry stated that Spurgeon's chief complaint was venous ulcers on both lower legs. Doc. 10-3 at 27. The records also stated that Spurgeon had "[n]o anxiety, no depression, and no sleep disturbances," and "[n]o skin lesions." Doc. 10-3 at 27–28. The records showed that Spurgeon suffered from isolated elevated blood pressure, "[c]hronic cutaneous ulcer venous stasis," "idiopathic peripheral autonomic neuropathy," dysautonomia, and "[a]djustment disorder with mixed emotional features." Doc. 10-3 at 28. Dr. Perry prescribed medication for Spurgeon's complaints. Doc. 10-3 at 28–29.

Spurgeon also submitted a "4.11 Listing Questionnaire" dated February 17, 2020, that Dr. William Barton Perry had filled out. An image of that document is

reproduced here:

**Dear Dr. Perry:**

**Please check all of the following that apply to the above claimant:**

| | |
|---|---|
| *Chronic venous insufficiency* of a lower extremity with incompetency or obstruction of the deep venous system and one of the following: | |
| 1.  Extensive brawny edema involving at least two-thirds of the leg between the ankle and knee or the distal one-third of the lower extremity between the ankle and hip. | ✓ |
| 2.  Superficial varicosities, stasis dermatitis, and either recurrent ulceration or persistent ulceration that has not healed following at least 3 months of prescribed treatment. | ✓ |

_____               2. 17. 20
**Dr. William Barton Perry**                      **Date**
Perry Medical Clinic

Doc. 10-3 at 17.[2]

### b.   Records from Dr. June Nichols

Spurgeon submitted records from a psychological examination performed by

Dr. June Nichols at Gadsden Psychological Services on February 27, 2020.  Doc.

10-3 at 9–16.  Dr. Nichols' records showed that Spurgeon submitted "extensive

---

[2] The record also shows that Spurgeon submitted medical charts from Dr. Brian A. Perry (a colleague of Dr. William Barton Perry), dated January 29, 2020, which included a general overview of Spurgeon's treatment at the Perry Medical Clinic. Doc. 10-3 at 30–34.  But Spurgeon makes no argument regarding those specific records (*see* Doc. 13 at 25–27; Doc. 16 at 1–3), and "a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed" (*Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004).

medical and psychiatric records for review." Doc. 10-3 at 12. Dr. Nichols summarized the records, which dated from 2014 to 2018 and showed that Spurgeon had cardiac problems, anxiety disorder, obesity, hypertension, migraines, symptomatic venous insufficiency, and arthritis in her knee. Doc. 10-3 at 13. Dr. Nichols also reviewed and recorded Spurgeon's personal, medical, and family history. Doc. 10-3 at 13–14.

Dr. Nichols performed a mental status examination and noted that Spurgeon was neat and clean and presented appropriately, had normal speech, a depressed mood, sad but appropriate affect, and a clear stream of thought. Doc. 10-3 at 14–15. Dr. Nichols found that Spurgeon's speed of mental processing was fair, her memory intact, her knowledge fund adequate, and her thought processes normal. Doc. 10-3 at 15.

Dr. Nichols included a summary of Spurgeon's daily activities, stating that Spurgeon lived with her son, got up in the mornings but kept "to herself because anxiety makes her too uncomfortable around people," cleaned her home and paid her bills, ate three meals per day, was not involved in the community, and had no friends. Doc. 10-3 at 15. Dr. Nichols stated that Spurgeon reported experiencing multiple symptoms of anxiety and depression based on underlying trauma that made it difficult for her to leave home and be around people. Doc. 10-3 at 15–16. Dr. Nichols stated that Spurgeon never had been involved in counseling and never had

been hospitalized for mental health issues.  Doc. 10-3 at 16.

Dr. Nichols opined that Spurgeon "would likely understand, remember and be able to carry out very short and simple instructions," but would "likely have difficulty maintaining attention, concentration, and/or pace for periods of at least two hours."  Doc. 10-3 at 16.  She also opined that Spurgeon would have difficulty with being on-time, "sustaining an ordinary work routine without special supervision," adjusting to work changes, interacting with supervisors or coworkers, maintaining socially appropriate behavior, and adhering to neatness or cleanliness standards.  Doc. 10-3 at 16.  Dr. Nichols stated that Spurgeon "would likely be off task 40 to 50% of the time" and "would likely miss 15 or more days in a 30 day period."  Doc. 10-3 at 16.  Dr. Nichols stated that "[t]his would have existed prior to 2/12/2016."  Doc. 10-3 at 16, 18.

Dr. Nichols diagnosed Spurgeon with obsessive compulsive disorder, panic disorder, post-traumatic stress disorder (partially resolved), POTS, dysautonomia, mitral valve prolapse, and chronic migraines.  Doc. 10-3 at 16.

### 5.    Appeals Council decision

Spurgeon sought review from the Appeals Council, arguing that she was entitled to benefits pursuant to "Listing 4.11" for chronic venous insufficiency, that the ALJ failed to accord proper weight to the opinions of her treating physician, Dr. William Barton Perry, and that the ALJ's decision was not based on substantial

evidence.  Doc. 10-7 at 150–72.

The Appeals Council denied Spurgeon's request for review, finding no reason to review the ALJ's decision.  Doc. 10-3 at 2.  Specifically, the Appeals Council stated that the records that Spurgeon submitted from the Perry Medical Clinic dated December 5, 2019, through January 9, 2020, and the medical statement from Dr. William Barton Perry dated February 17, 2020, were not related to the relevant period.  Doc. 10-3 at 3.  The Appeals Council did not address or list as an exhibit the psychological evaluation report from Dr. Nichols.  Doc. 10-3 at 2–7.

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards, that the Appeals Council did not err in denying review, and that there is no basis for remand pursuant to Sentence 6 or Sentence 4 of 42 U.S.C. § 405(g).

**I.   Substantial evidence supported the ALJ's determination that Plaintiff Spurgeon did not satisfy the criteria for disability under "Listing 4.11" (chronic venous insufficiency).**

Substantial evidence supported the ALJ's determination that Plaintiff Spurgeon did not satisfy the criteria for disability under "Listing 4.11" for chronic venous insufficiency.   As explained above, the ALJ evaluated Spurgeon's application for disability benefits using the five-step sequential process.  Doc. 10-3 at 64; *see also* 20 C.F.R. § 404.1520(a)(4); *Winschel*, 631 F.3d at 1178.  The third

step of that process required the ALJ to determine whether Spurgeon's impairment or combinations of impairments met or equaled the severity of the specified impairments in any "Listing of Impairments."  Doc. 10-3 at 65–67.  Spurgeon argues that the treatment records from Dr. William Barton Perry before both the ALJ and the Appeals Council confirmed that Spurgeon met the requirements for disability under Listing 4.11 for chronic venous insufficiency.  Doc. 13 at 27–28.

At step three, if a claimant has an impairment that meets or equals a Listing in 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, and satisfies the duration requirement, then the ALJ must find that the claimant is disabled.  *See* 20 C.F.R. § 404.1420(a)(4)(iii). To establish a presumption of disability based on a Listing, a claimant must show "a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement."  *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (citations omitted); *see Sullivan v. Zebley*, 493 U.S. 521, 530–32 (1990) (similar).

To satisfy the criteria for disability under Listing 4.11, Spurgeon must prove that, on or before the date she was last insured, she suffered from "chronic venous insufficiency of a lower extremity with incompetency or obstruction of the deep venous system," and either "extensive brawny edema" or "[s]uperficial varicosities, stasis dermatitis, and either recurrent ulceration or persistent ulceration that has not healed following at least 3 months of prescribed treatment."  20 C.F.R. Pt. 404,

Subpt. P, App. 1, § 4.11.

The ALJ found that "the evidence of record does not show that the claimant's impairment meets or medically equals these conditions."   Doc. 10-3 at 65. Substantial evidence supported that determination.

First, the fact that Dr. Perry filled out a checklist indicating that Spurgeon met the criteria for Listing 4.11 (Doc. 10-3 at 17) is not determinative.   The "determination" and "decision" whether a claimant is disabled is "reserved to the Commissioner"; consequently, statements about whether or not an impairment "meets or medically equals any listing in the Listing of Impairments in Part 404, Subpart P, Appendix 1" are "inherently neither valuable nor persuasive."  20 C.F.R. § 404.1520b(c)(3)(iv).

Furthermore, while Spurgeon was diagnosed with chronic venous insufficiency (*see, e.g.*, Doc. 10-10 at 20–22, 82–83), "impairment(s) cannot meet the criteria of a listing based only on a diagnosis."  20 C.F.R. § 404.1525(d).  To satisfy the criteria of a Listing, the claimant "must have a medically determinable impairment[] that satisfies all of the criteria in the listing."  *Id.*  Consequently, without more, the fact of Spurgeon's diagnosis with venous insufficiency does not satisfy the criteria of Listing 4.11.

In addition, other record evidence supported the ALJ's determination that Spurgeon did not meet the requirements for Listing 4.11.  The record shows that,

27

after Spurgeon's ablation treatment, Dr. Narayan found that Spurgeon had good blood flow, no clotting, and no evidence of peripheral vascular disease. Doc. 10-10 at 135–37, 223–34. Further, while there were times that Spurgeon had some edema (*see* Doc. 10-10 at 20–22), the record has no clear indication of "extensive brawny edema" except in the conclusory checklist that Dr. William Barton Perry completed in February 2020 (*see* Doc. 10-3 at 17). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.11. And, while Spurgeon sometimes suffered from stasis dermatitis and ulceration (*see* Doc. 10-10 at 82–83; Doc. 10-3 at 28–30), the record does not show a combination of stasis dermatitis "and either recurrent ulceration or persistent ulceration that has not healed following at least 3 months of prescribed treatment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.11.

Accordingly, a reasonable person would accept the ALJ's finding that Spurgeon did not satisfy the criteria for disability under Listing 4.11, and substantial evidence supported the ALJ's determination. *See Crawford*, 363 F.3d at 1158.

## II.   The ALJ did not err in finding unpersuasive the opinions of Plaintiff Spurgeon's treating physician, Dr. William Barton Perry.

The ALJ did not err in finding unpersuasive the opinions of Plaintiff Spurgeon's treating physician, Dr. William Barton Perry. Spurgeon argues that the ALJ erred in failing to accord proper weight to Dr. William Barton Perry's July 9, 2018 opinions that Spurgeon was disabled. Doc. 13 at 29–30. Specifically, Spurgeon argues that Dr. Perry opined that Spurgeon was disabled in his "Physical

Capacities Form" and "Mental Health Source Statement," both dated July 9, 2018. Doc. 13 at 29.  Spurgeon argues that Dr. Perry's opinions were well supported by the record, and that in the Eleventh Circuit the opinion of a treating physician must be given substantial or considerable weight unless good cause is shown to the contrary.[3]  Doc. 13 at 30.  In a supplemental filing, Spurgeon argues further that the treating physician rule applies to her case (notwithstanding that the SSA has promulgated new regulations regarding the consideration of medical opinions), such that Dr. Perry's opinions should have been given considerable weight.  Doc. 22.

The SSA has revised its regulations on the consideration of medical opinions. Under the new regulations, for all claims filed on or after March 27, 2017 (like the claim in this case), an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," including the opinion of a treating physician.  20 C.F.R. §§ 404.1520c(a), 416.920c(a).

Instead, the ALJ considers the persuasiveness of each medical opinion using the following five factors:  (1) supportability; (2) consistency; (3) the relationship with the claimant, including the length of the treatment relationship, the frequency

---

[3] The Eleventh Circuit and other Courts of Appeals developed the treating physician rule "as a means to control disability determinations by administrative law judges under the Social Security Act."  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829 (2003).  Under that rule, the Eleventh Circuit required an ALJ to articulate good cause for discounting the opinion of a treating physician.  *See Winschel*, 631 F.3d at 1179.

of examinations, and the purpose and extent of the treatment relationship; (4) specialization; and (5) other factors, including evidence showing that the medical source has familiarity with other evidence or an understanding of the SSA's policies and evidentiary requirements.  20 C.F.R. §§ 404.1520c(c).

Supportability and consistency are the most important factors, and the ALJ must explain how the ALJ considered those factors.  20 C.F.R. §§ 404.1520c(b)(2). The ALJ may explain how the ALJ considered the other factors, but the ALJ is not required to do so.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

Historically, the Eleventh Circuit's treating physician rule required that an ALJ give the opinion of a treating physician "substantial or considerable weight unless 'good cause' is shown to the contrary."  *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004) (quotation marks and citation omitted).  Good cause exists under the following circumstances:  "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) [the] evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Id.* at 1240–41.

However, in a recent unpublished opinion, the Eleventh Circuit reasoned that, "[f]or claims filed on or after March 27, 2017, . . . no significant weight is given to statements made by treating physicians as opposed to non-treating medical sources." *Planas ex rel. A.P. v. Commissioner of Soc. Sec.*, 842 F. App'x 495, 497 n.1 (11th

Cir. 2021).

In this case, Spurgeon's treating physician—Dr. William Barton Perry—opined in his July 9, 2018 "Physical Capacities Form" that Spurgeon could only physically sit or stand for an hour at a time, would have to keep her legs above waist level for 5 hours per day, would be off-task 60% of the time, and would miss 10 days of work per month due to her physical problems.  Doc. 10-10 at 92.  Dr. Perry also opined in his July 9, 2018 "Mental Health Source Statement" that Spurgeon would be largely unable to meet workplace expectations, would be off-task 80% of the time, and would miss 15 out of 30 workdays because of her mental health issues. Doc. 10-10 at 91.

In this regard, the ALJ found Dr. Perry's opinions "unpersuasive" because "they provide no nexus between the conditions he cites and the limitations such as being off-task, missing ten days of work per month, and the requirement of lying down, sleeping, and propping the legs above waist for five hours per day."  Doc. 10-3 at 73.

The ALJ specifically addressed Spurgeon's medical records from Dr. William Barton Perry's office from October 2014 to July 2019, stating that the records showed that Spurgeon had been encouraged to exercise, had mostly normal test results, had controlled her anxiety disorder with Xanax, and was taking other medication to control her symptoms.  Doc. 10-3 at 73–74.  The ALJ also stated that

Dr. Perry's opinions were inconsistent with the records of other medical providers, which indicated that Spurgeon's test results were largely normal, that her mental health problems did not significantly affect her ability to function, that she never had been hospitalized or treated by a specialist for mental health issues, that she could exercise and perform many daily activities, and that her legs had been improved by her ablation procedure.  Doc. 10-3 at 74.

Thus, the ALJ provided an extensive and detailed explanation that Dr. William Barton Perry's July 9, 2018 opinions were neither consistent with nor supported by the record.  Rather, Dr. Perry's opinions about Spurgeon's disability were contradicted by the other information throughout Spurgeon's medical records. That exhaustive analysis and explanation satisfies the ALJ's regulatory obligation to consider medical opinions under the new regulations.  *See* 20 C.F.R. § 404.1520c(b)(2).  Even under the Eleventh Circuit's treating physician rule (if it still applies), the ALJ's explanation of the inconsistencies between Dr. Perry's opinions and the rest of the record demonstrates good cause for not assigning any considerable weight to Dr. Perry's opinions.  *See Phillips*, 357 F.3d 1232, 1240–41. Accordingly, substantial evidence supported the ALJ's determination, and Spurgeon cannot show that the ALJ erred in finding Dr. Perry's opinions unpersuasive.

## III.   The Appeals Council did not err in declining to review the new evidence that Plaintiff Spurgeon submitted.

The Appeals Council did not err in declining to review the additional evidence

that Plaintiff Spurgeon submitted.  Spurgeon argues that the Appeals Council erred in failing to consider records from Dr. William Barton Perry that "confirm[ed] eligibility under Listing 4.11," and a psychological evaluation from Dr. Nichols. Doc. 13 at 26.  Spurgeon argues that the Appeals Council erred in determining that the submissions from Dr. William Barton Perry were not chronologically relevant, and in failing to mention at all the psychological evaluation from Dr. Nichols.  Doc. 13 at 26.  Spurgeon filed supplemental authority in support of her position, relying on the Eleventh Circuit's decision in *Pupo v. Commissioner, Soc. Sec. Admin.*, 17 F.4th 1054 (11th Cir. 2021).  Doc. 21.

"'With a few exceptions, a claimant is allowed to present new evidence at each stage of the administrative process,' including before the Appeals Council." *Washington v. Social Sec. Admin., Comm'r*, 806 F.3d 1317, 1320 (11th Cir. 2015) (quoting *Ingram v. Commissioner of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007)).  "The Appeals Council will review a case if it 'receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision.'"  *Pupo*, 17 F.4th at 1063 (quoting 20 C.F.R. § 416.1470(a)(5)).

"[W]hen the Appeals Council erroneously refuses to consider evidence, it commits legal error and remand is appropriate."  *Washington*, 806 F.3d at 1321.  The

court reviews de novo whether supplemental evidence is new, material, and chronologically relevant.  *Id.*

### A.    Medical records from Dr. William Barton Perry

Spurgeon submitted records from Dr. William Barton Perry from late 2019 and early 2020.  Doc. 10-3 at 24–30.  The records showed that Spurgeon did not have ulcers on her legs in December 2019, but developed venous ulcers by January 2020.  Doc. 10-3 at 24–30.  Spurgeon also submitted a "4.11 Listing Questionnaire" from Dr. William Barton Perry in which he checked boxes showing that she met the requirements for chronic venous insufficiency under Listing 4.11.  Doc. 10-3 at 17. The Appeals Council stated that the ALJ had decided the case through November 13, 2019 (the date of the ALJ's decision), so the additional evidence that Spurgeon submitted did not relate to the relevant period.  Doc. 10-3 at 3.

The information that Spurgeon submitted from Dr. William Barton Perry was not chronologically relevant.  *See Washington*, 806 F.3d at 1320.  New evidence is chronologically relevant if it "relates to the period on or before the date of the [ALJ] hearing decision."  20 C.F.R. § 404.970(b); *see also Keeton v. Department of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (the Appeals Council shall "evaluate the entire record including the new and material evidence submitted to it if it relates to the period on or before the date of the [ALJ] hearing decision" (quoting 20 C.F.R. §§ 404.970(b), 416.1470(b))).

All of the information submitted from Dr. William Barton Perry related to the time period after the ALJ's decision.   Because that information was not chronologically relevant (*see* 20 C.F.R. § 404.970(b)), the Appeals Council did not err in declining to consider the evidence (*see Pupo*, 17 F.4th at 1063).

### B.   Dr. Nichols' psychological evaluation

Spurgeon submitted to the Appeals Council a psychological evaluation from Dr. Nichols that was dated February 27, 2020, and in which Dr. Nichols evaluated Spurgeon's mental status and considered Spurgeon's history and medical records. Doc. 10-3 at 9–16.  Dr. Nichols opined that Spurgeon would have difficulty behaving appropriately at work, would likely be off-task 40-to-50% of the time, and would likely miss 15 out of 30 workdays.  Doc. 10-3 at 16.  Dr. Nichols opined that "this would have existed prior to 2/12/2016."  Doc. 10-3 at 16.

The Appeals Council did not mention or clearly address Dr. Nichols' opinion. Doc. 10-3 at 3.  Nevertheless, the court must consider whether Dr. Nichols' opinion qualifies as new, material, and chronologically relevant evidence that the Appeals Council erroneously failed to review.  *See Washington*, 806 F.3d at 1320–21.

There was not a reasonable probability that Dr. Nichol's opinion would change the outcome of the decision.  *See Pupo*, 17 F.4th at 1063.  While Dr. Nichols stated that the conditions she noted would have existed prior to 2016, her opinion— like Dr. William Barton Perry's "Mental Health Source Statement" opinion dated

July 9, 2018—is not consistent with other medical records from the relevant time period that were submitted to the ALJ.

The record shows on multiple occasions that Spurgeon's anxiety was controlled with Xanax. *See* Doc. 10-9 at 126–28, 153; Doc. 10-10 at 27. Further, when Dr. Bynum examined Spurgeon, he found that her primary impairments were medical rather than attributable to her mental health. Doc. 10-10 at 29. Even after the date of the ALJ's decision, Dr. William Barton Perry also noted as late as January 2020 that Spurgeon had "[n]o anxiety, no depression, and no sleep disturbances." Doc. 10-3 at 27–28. All of these contemporaneous records regarding Spurgeon's mental health contradict Dr. Nichols' opinion, which was based on a psychological evaluation in February 2020—i.e., after the relevant period.

Not only was Dr. Nichols' opinion contradicted by the record evidence, but also that opinion was similar to Dr. William Barton Perry's July 9, 2018 "Mental Health Source Statement"—which the ALJ found unpersuasive and unsupported by the record. *See* Doc. 10-3 at 73–74. Dr. Nichols' opinions that Spurgeon would be off-task almost half the time and would miss work half the month have no clear basis in the report. Nor are those opinions supported by her examination findings that Spurgeon's mental status and general thought processes were largely normal, and that Spurgeon never had been involved in counseling. *See* Doc. 10-3 at 14–16. The lack of foundation, combined with the facts that the examination took place after the

relevant time period and that Dr. Nichols had no treatment relationship with Spurgeon, eliminates any conceivable possibility that Dr. Nichol's opinion would change the outcome of the decision.  *See* 20 C.F.R. §§ 404.1520c(c).

Because the evidence from Dr. Nichols was inconsistent with the record and unsupported by Dr. Nichols' contemporaneous examination, the evidence does not create a reasonable probability that the outcome of the proceedings would have changed.   Thus, the Appeals Council did not err in declining to consider the evidence. *See Washington*, 806 F.3d at 1321.

## IV.    There is no basis for remand pursuant to Sentence 6 or Sentence 4 of 42 U.S.C. § 405(g).

Finally, there is no basis for remand pursuant to Sentence 6 or Sentence 4 of 42 U.S.C. § 405(g).  In her motion to remand, Plaintiff Spurgeon argues that the court should remand the case pursuant to Sentence 6 of 42 U.S.C. § 405(g) because of both a subsequent fully favorable benefits decision with an onset date of March 31, 2020, and the opinions of Dr. William Barton Perry and Dr. Nichols that were submitted to the Appeals Council (*see* Part III *supra*).  Doc. 17 at 1.

Spurgeon also moves for remand pursuant to Sentence 4 of 42 U.S.C. § 405(g), arguing that the subsequent fully favorable decision and the evidence submitted to the Appeals Council undermine the decisions of the ALJ and the Appeals Council in this case.  Doc. 17 at 2.

As an initial matter, without more, a subsequent favorable decision does not

invalidate a prior denial of benefits.  In *Hunter v. Commissioner*, the Eleventh Circuit reasoned that a denial of benefits and a subsequent favorable decision were "seemingly irreconcilable," but concluded that—in light of the deferential standard of review that the federal courts apply with respect to an ALJ's decision—"there is no inconsistency in finding that two successive ALJ decisions are supported by substantial evidence even when those decisions reach opposing conclusions."  808 F.3d 818, 822 (11th Cir. 2015).  According to the Eleventh Circuit, even when "[f]aced with the same record, different ALJs could disagree with one another based on their respective credibility determinations and how each weighs the evidence," such that "[b]oth decisions could nonetheless be supported by evidence that reasonable minds would accept as adequate."  *Id.*  As a result, "the mere existence of a later favorable decision by one ALJ does not undermine the validity of another ALJ's earlier unfavorable decision or the factfindings upon which it was premised." *Id.*  Accordingly, in Spurgeon's case, a subsequent favorable decision alone does not warrant remand.

### A.    Sentence 6

Sentence 6 of Section 405(g) allows a district court to remand a case to the Commissioner to consider new evidence presented for the first time in the district court.  *Ingram*, 496 F.3d at 1267; *see* 42 U.S.C. § 405(g) (providing that the court may "at any time order additional evidence to be taken before the Commissioner of

Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding").

The Eleventh Circuit has held that "a later favorable decision is not evidence for § 405(g) purposes." *Hunter*, 808 F.3d at 822. Thus, Spurgeon's subsequent favorable determination of benefits alone does not constitute newly discovered evidence warranting remand under Sentence 6. *See id.*

In her motion to remand, Spurgeon cites *Lindsey v. Commissioner*, in which the Eleventh Circuit reasoned that—while a subsequent favorable decision is not newly discovered evidence—the evidence supporting a subsequent favorable decision may constitute newly discovered evidence. 741 F. App'x 705, 710 (11th Cir. 2018). But Spurgeon identifies no new evidence that was not submitted to either the ALJ or the Appeals Council in the course of adjudicating her claim for benefits in this case. Accordingly, Spurgeon has not adduced any new evidence that would support a Sentence 6 remand, and *Lindsey* is not applicable here. *See Ingram*, 496 F.3d at 1267.

## B.    Sentence 4

Sentence 4 "describes an entirely different kind of remand" than Sentence 6. *Ingram*, 496 F.3d at 1267 (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). Under Sentence 4, "a reviewing court is limited to the certified

administrative record in examining the evidence." *Id*. at 1268 (quoting *Caulder*, 791 F.2d at 876). A claimant "may seek a remand based on evidence that was properly before the Commissioner under sentence four of 42 U.S.C. § 405(g), if he shows that the decision to deny benefits was not supported by substantial evidence in the record as a whole based on the evidence that the Appeals Council did not adequately consider." *Lindsey*, 741 F. App'x at 70 (citing *Ingram*, at 1266–68). A Sentence 4 remand order must "accompany a final judgment affirming, modifying, or reversing the administrative decision." *Melkonyan v. Sullivan*, 501 U.S. 89, 101–02.

Because Spurgeon's subsequent favorable decision was not part of the administrative record before the ALJ and the Appeals Council in this case, that subsequent decision cannot support a remand under Sentence 4. *See Ingram*, 496 F.3d at 1267–68 ("[E]vidence first presented to the district court should not be considered for the purposes of a [Sentence 4] remand."). Plus, as explained above in Parts I–III *supra*, substantial evidence supported the ALJ's decision, even in light of the evidence that Spurgeon submitted to the Appeals Council.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the court **AFFIRMS** the Commissioner's decision, and **DENIES** Plaintiff Spurgeon's motion

to remand (Doc. 17).  The court separately will enter final judgment.

**DONE** and **ORDERED** this March 9, 2022.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE